**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOTER TECHNOLOGIES, LLC,<br><br>Plaintiff and Counterclaim Defendant,<br><br>      v.<br><br>IP VIDEO CORPORATION, A+ TECHNOLOGY & SECURITY SOLUTIONS, INC., HALO SMART SOLUTIONS, INC. & ADVANCE CONVERGENCE GROUP, INC.<br><br>Defendants. | Civ. No. 2:20-cv-02989(GRB)(AKT)<br><br>PUBLIC VERSION |
| IP VIDEO CORPORATION AND HALO SMART SOLUTIONS, INC.,<br><br>Counterclaim Plaintiffs,<br><br>      v.<br><br>INTELLIGENT PRODUCT SOLUTIONS, INC. and DEREK PETERSON,<br><br>Third Party Defendants. | |

---

**PLAINTIFF SOTER TECHNOLOGIES, LLC'S**
**OPENING BRIEF IN SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTIONS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................... 1

II.    BACKGROUND OF THE INVENTION .......................................................... 1

III.   THE '549 PATENT ............................................................................... 2

IV.    CLAIM CONSTRUCTION PRINCIPLES ........................................................ 4

V.     DISPUTED TERMS FOR CONSTRUCTION ................................................... 6

       A.    "air quality" .......................................................................... 6

       B.    "air quality sensor" ................................................................ 8

       C.    "abnormality matching signature" ........................................... 8

       D.    "abnormality matching signature of vaping" ............................ 13

       E.    "a signature" ....................................................................... 16

       F.    "the abnormality matching signature includes …" or "the signature
             includes …" ........................................................................ 18

       G.    "identify vaping" or "vaping is identified" (claims 1, 13, 25) ............ 19

       H.    "sound detector" .................................................................. 19

       I.    "detected sounds" ................................................................ 20

VI.    CONCLUSION ..................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AllVoice Computing PLC v. Nuance Communications, Inc.*,
  504 F.3d 1236 (Fed. Cir. 2007)......................................................................12

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
  726 F.3d 1296 (Fed. Cir. 2013)....................................................................5, 14

*Comark Communs., Inc. v. Harris Corp.*,
  156 F.3d 1182 (Fed. Cir. 1998)....................................................................5, 14

*Falana v. Kent State University*,
  669 F.3d 1349 (Fed. Cir. 2012)......................................................................12

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)......................................................................16

*Johnson Worldwide Associates, Inc. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999).........................................................................9

*Multiform Desiccants, Inc. v. Medzam Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998).......................................................................6

*Mycogen Plant Sci., Inc. v. Monsanto Co.*,
  243 F.3d 1316 (Fed. Cir. 2001)...............................................................4, 14, 17

*Northrop Grumman Corp. v. Intel Corp.*,
  325 F.3d 1346 (Fed. Cir. 2003)......................................................................12

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................ *passim*

*Praxair, Inc. v. ATMI, Inc.*,
  543 F.3d 1306 (Fed. Cir. 2008)......................................................................19

*Rambus Inc. v. Infineon Techs. Ag*,
  318 F.3d 1081 (Fed. Cir. 2003)......................................................................18

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002).......................................................................5

*Thorner v. Sony Computer Ent'mt Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)......................................................................12

Plaintiff Soter Technologies LLC respectfully submits this opening brief in support of its proposed constructions of the asserted claim terms of U.S. Patent No. 10,699,549 ("the '549 Patent") that have been identified by the parties as requiring construction and in opposition to Defendants' proposed constructions of those claim terms.

## I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendants' proposed constructions are divorced from the meaning a person of skill in the art (POSA) would ascribe to the claims.  Defendants blatantly attempt to limit the scope of the claims to particular embodiments and examples appearing in the patent specification—in violation of clear Federal Circuit authority.  Defendants' proposed constructions are also inconsistent with the claims themselves, the applicants' objectives disclosed in the specification and the meanings that the Examiners and Soter ascribed to the terms during prosecution.  The court should interpret the claims as a POSA would and adopt Soter's proposed constructions.

## II.  BACKGROUND OF THE INVENTION

In 2017, Inventors Derek Peterson and Billy Schweigert conceived of and built the first device able to detect vape, and filed a patent application disclosing that novel invention.  *See* (Ex. A & Ex. L, Schweigert Decl.)



Through hard work and collaboration with two other inventors, Asheik Hussain and Mohammed

Elbadry, the inventors secured the '549 Patent whose terms are at issue here. S*ee* (Ex. J, Hussain

Decl.; Ex. K, Elbadry Decl.; Ex. F, Elbadry Dep. 64:16-74:9).

## III.    THE '549 PATENT

As described in the '549 Patent, Soter's invention is directed to "[a] sensor system for

identifying vaping, other smoking activities, and bullying at a site." (Ex. B, Abstract).  As noted in

the Abstract, the patent is related to a sensor system for identifying vaping and bullying which

includes an "air quality sensor configured to detect air quality, a sound detector configured to detect

sounds, and a network interface configured to transmit a signal indicating an abnormality matching

signature of vaping or sound of bullying.

The '549 Patent notes that "Vaping and bullying have been serious problems in enclosed

areas of academic/business environments due to hazardous/harmful impacts on people."   (Ex. B

col. 1:26-28).  The '549 Patent notes that while the traditional method of detecting these problems

was "camera surveillance[,]" "such camera surveillance systems have not been used in private areas

such as restrooms, bathrooms, shower rooms, or hospital rooms because privacy has more weights

than identification of bullying and vaping/smoking."  (*Id*. at col. 1:34-39).  As a result, the patent

concludes that "effective identification of vaping/smoking and bullying is in dire need in

academic/business environments for safety and public health purposes."  (*Id*. at col. 1:52-54).

To this end, the Summary of the Invention describes a number of different aspects of the

invention to solve this problem.  In one embodiment, the invention includes "a sensor system for

identifying vaping, other smoking activities, and bullying at a site includes an air quality sensor

configured to detect air quality, a sound detector configured to detect sounds, and a network

interface configured to transmit a signal indicating abnormality matching signature of vaping, other

smoking activity, or sound of bullying.  The vaping or another smoking activity is identified based

2

on the detected air quality, and the bullying is identified based on the detected sound." (*Id.* col. 1:61-2:2).  The patent also identifies other aspects or objects of the invention, including:

- "In an aspect, the sensor system is powered via power over Ethernet or power over Ethernet +." (Ex. B, col. 2:3-5)

- "In another aspect, the vaping or the another smoking activity is identified when the detected air quality includes a signature. The signature includes a temperature range, a hydrogen range, and a humidity range." (*id.* at col. 2:8-10)

- "In yet another aspect, the air quality sensor is location-independent." (*id.* at col. 2:13-14)

- "In yet another aspect, the sound detector is location-dependent." (*id.* at col. 2:15-16)

- "In yet another aspect, an alert is transmitted silently from the site to a user when the vaping, or another smoking activity, or bullying is detected." (*id.* at col. 2:23-25)

The Summary of the Invention describes numerous other embodiments and aspects.  While the invention described is directed to a system for detecting vaping, smoking and bullying, the claims that issued are directed to a system that identifies vaping based on an abnormality matching signature of vaping.  For instance claim 1 recites:

1.  A sensor system comprising:

an air quality sensor configured to detect air quality, the air quality sensor including a combination of sensors configured to sense air quality; and

a network interface configured to transmit a signal indicating abnormality matching signature of vaping, and

a controller configured to identify vaping based on the detected air quality, wherein the vaping is identified when the detected air quality includes the abnormality matching signature.

Other aspects of the inventions are described in dependent claim limitations.  For instance, claim 2 provides an embodiment wherein "the abnormality matching signature includes a

temperature range, a hydrogen range, and a humidity range." Claim 5 provides an embodiment where "the air quality sensor is location-independent." Claim 6 provides an embodiment wherein the sensor system "further compris[es] a sound detector configured to detect sounds, wherein the controller is configured to identify potential bullying based on the detected sounds . . . ." The patent states clearly that it is not limited to the examples provided therein and may be modified within the spirit of the disclosure. (Ex. B, col. 13:12-18) (stating "it is to be understood by one skilled in the art that the present disclosure is not limited to the examples described in the present disclosure").

## IV.    CLAIM CONSTRUCTION PRINCIPLES

A patent's claims "define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (citations omitted). To determine their meaning, courts first consider the intrinsic evidence, including the claims, specification, and prosecution history. *Id*. at 1315-17. Courts are tasked with giving claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention, in the context of the entire patent. *Id.* at 1312-13.

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips,* 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among claim terms can also assist in understanding a term's meaning. *Id.* "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15; *see also Mycogen Plant Sci., Inc. v. Monsanto Co.,* 243 F.3d 1316, 1329 (Fed. Cir. 2001) ("Under the doctrine of claim differentiation, there is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in

meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant.")

The claims, however, do not stand alone. Instead, "they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Phillips,* 415 F.3d at 1315 (citations omitted). For this reason, "claims must be read in view of the specification." *Id.* "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* The specification may assist in resolving ambiguity where the ordinary meaning of words used in the claims lack sufficient clarity to permit their scope to be ascertained from the words alone. *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed. Cir. 2002). However, "particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Communs., Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *see also Aria Diagnostics, Inc. v. Sequenom, Inc.,* 726 F.3d 1296, 1301 (Fed. Cir. 2013) ("even if a specification has only one embodiment, its claims will not be confined to that example unless the patentee has demonstrated a clear intention to limit the claim scope using words or expression of manifest exclusion or restriction.")

The prosecution history, including "the complete record of the proceedings before the PTO and . . . prior art cited during the examination of the patent," may also supply context for claim construction. *See Phillips,* 415 F.3d at 1317. Like the specification, "the prosecution history provides evidence of how the PTO and the inventor[s] understood the patent." *Id.* "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

"It is the person of ordinary skill in the field of the invention through whose eyes the claims

are construed." *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

"Such person is deemed to read the words used in the patent documents with an understanding of

their meaning in the field, and to have knowledge of any special meaning and usage in the field."

*Id.* "The inventor's words that are used to describe the invention -- the inventor's lexicography --

must be understood and interpreted by the court as they would be understood and interpreted by a

person in that field of technology." *Id.*; *see also Phillips,* 415 F.3d at 1313.

## V.  DISPUTED TERMS FOR CONSTRUCTION

### A.  "air quality"

| Term/Phrase | Soter's Construction | Defendants' Construction |
|---|---|---|
| "air quality"<br>(claims 1, 13, 25) | "one or more parameters relating to the content or condition of the air that is present at a site" | "measures of certain properties or contents of air" |

As discussed above, the '549 Patent makes clear that the sensor system of the invention is,

in part, monitoring the air quality present at a site.  *See e.g.,* (Ex. B, Abstract, col 1:18-22); (Ex. S,

Sharony Decl., ¶¶ 31-32).  This is because "[v]aping and bullying have been serious problems <u>in</u>

<u>enclosed areas</u> of academic/ business environments due to hazardous/harmful impacts on people."

(Ex. B, col. 1:25-28) (emphasis added).

Moreover, air quality is generally understood to be measured by one or more detectable

parameters.  *See* (Ex. S, Sharony Decl., ¶ 30).  This is reflected in the prior art cited during

prosecution of the '549 Patent.  U.S. Patent No. 6,711,470 to Hartenstein shows that "air quality"

can be associated with numerous different factors such as carbon dioxide, carbon monoxide,

formaldehyde, nitrogen dioxide, ozone, radon and progeny, sulfur dioxide, a number of VOCs,

temperature, smoke, and humidity. (Ex. R, Hartenstein, col. 2:33-39, at SOTER EDNY 3075).

U.S. Patent Application No. 2015/0020614 to Gettings shows that air quality can be associated with

levels of volatile organic compounds and allergens. (Ex. O, Gettings, [0178], at SOTER EDNY

3131).  Similarly, **U.S. Patent Application No. 2016/0063841 to Schultz notes that** "[a]ir quality may be affected by a wide range of factors including temperature, humidity, air-flow, occupancy, particulate counts, the presence of various chemical and biologic materials, and/or the like." (Ex. P, Schultz, [0001], at SOTER EDNY 3200).

U.S. Patent Application No. 2015/0323427 to Sharp illustrates, consistent with the '549 Patent, that air quality is associated with the condition of the air at a location and is determined by "air quality parameters."  (Ex. M, Sharp, [0004], at SOTER EDNY 3173).  In fact, Sharp discusses the use of "one or more environmental or air quality parameter sensors to measure one or more air quality parameters in a plurality of locations . . . ." (*Id.*)

Defendants' expert, Dr. Brown, criticizes Soter's proposed construction of "air quality" on the grounds that it uses the term "parameter" to describe air quality. (Ex. I, Brown Decl. ¶ 23). Notably, Dr. Brown does not explain what the purported proper construction of "air quality" is, nor does he dispute that, as shown above, it was known in the art to describe air quality in terms of one or more parameters.  Dr. Brown claims that the '549 Patent uses the term parameter in terms of operational parameters.  (Ex. I, Brown Decl. ¶ 23).  Even if that were the case, Brown does not explain why a POSA could not also use the term parameter to define air quality or define air quality in terms of one or more parameters.  Dr. Brown does not identify any other terms or definitions that are used to describe air quality.

Dr. Brown suggests that use of the term "parameter" in connection with the definition of air quality would be inconsistent with Soter's proposed construction of abnormality matching signature of vaping, which he rejects.  (Ex. I, Brown Decl. ¶ 25).  However, there is nothing improper about associating the term parameters with both air quality and an "abnormality matching signature of vaping" especially when, for example, claim 1 states that "the detected air quality includes the

abnormality matching signature." *See* (Ex. T, Sharony Dep. 57:11-17 (noting that the dictionary definition of "parameter" includes "[a]ny of a set of physical properties whose value determine the characteristic or behavior of something," such as, "[p]arameter of atmosphere, touches, temperature, pressure or density.")).  Further, Dr. Brown does not criticize the portion of the definition that requires "air quality" to be associated with "the content or condition of the air that is present at a site."

      **B.**      **"air quality sensor"**

| Term/Phrase | Soter's Construction | Defendants' Construction |
|---|---|---|
| "air quality sensor" (claims 1, 13, 25) | "a sensor capable of sensing or detecting one or more parameters of air quality that is present at a site" | "a sensor for measuring the certain properties and/or contents of air" |

Given the definition of "air quality" discussed above, Soter's proposed construction of "air quality sensor" necessarily follows. (Ex. S, Sharony Decl., ¶ 43).  Dr. Brown's only criticism of Soter's proposal is that aspects may be redundant to the definition of "air quality."  (Ex. I, Brown Decl. ¶ 26).   However, any purported redundancy does not make Soter's construction *per se* improper.

Dr. Brown does not contend that a POSA would not understand that an "air quality sensor" would sense or detect one or more parameters of air quality.  Indeed, as discussed above, U.S. Patent Application No. 2015/0323427 to Sharp (Ex. M), disclosed during prosecution of the '549 Patent, clearly illustrates that a POSA would understand that an "air quality sensor" senses or detects one or more parameters of air quality.  Dr. Brown does not contend that a POSA would not understand that the air quality sensor is sensing or detecting air quality present at a site.

      **C.**      **"abnormality matching signature"**

| Term/Phrase | Soter's Construction | Defendants' Construction |
|---|---|---|
| "abnormality matching signature" (claims 1, 13, 25) | "one or more parameters, such as a window size, | Defendants contend that the term "abnormality matching |

| | threshold values or ranges, from a sensor indicating the presence of conduct to be detected, such as vaping, smoking and bullying" | signature" standing alone is not in the claims of the '549 Patent and therefore construction of this term is improper. |
|---|---|---|

As discussed above, "abnormality matching signature" is a phrase used in the patent relating to sensing or detecting certain conduct that is harmful in environments such as schools. An "abnormality matching signature" is used to identify vaping, smoking and bullying. (Ex. S, Sharony Decl., ¶ 51-52). *See Johnson Worldwide Associates, Inc. v. Zebco Corp*., 175 F.3d 985, 991 (Fed. Cir. 1999) ("[v]aried use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition.") The patent teaches that the "abnormality matching signature" is determined by one or more parameters sensed or detected by a sensor and provides examples of window size, threshold value or ranges. (Ex. B, col. 7:1-3). It is not a phrase used only to describe detecting vape. *See id.* (stating that "Bullying or vaping identification algorithm parameters may include a window size or threshold values or ranges"); *see also* (Ex. T, Sharony Dep. 125-149).

Indeed, Soter's patent application filed in 2019 associated "abnormality matching signature" with sensing or detecting vaping, *or* other smoking activity, *or* bullying:

> [Claim 1]. A sensor system for identifying vaping, other smoking activities, and bullying at a site, the sensor system comprising:
> …
> a network interface configured to transmit a signal indicating abnormality matching signature of vaping, other smoking activity, or sound of bullying,
> … (Ex. U, SOTER EDNY 2809)

As Dr. Sharony notes, signature is a common term used in electronic systems, including electronic systems that employ sensors. (Ex. S, Sharony Decl., ¶ 53). Indeed, the term appears repeatedly in the prior art cited during prosecution of the '549 Patent. U.S. Patent Application No. 2015/0020614 to Gettings uses the term signature in connection with infrared sensing of

biological life. (Ex. O, Gettings [0149], at SOTER EDNY 3128). U.S. Patent Application No. 2015/0235652 to Moser uses the term signature in connection with reception and processing of sound. (Ex. N, Moser [0016], at SOTER EDNY 3159). U.S. Patent Application No. 2016/0063841 to Schultz uses the term signature in connection with passive infrared imaging. (Ex. P, Schultz [0050], at SOTER EDNY 3204). U.S. Patent Application No. 2016/0212828 to Leinen uses the term signature in connection with LED fixtures. (Ex. Q, Leinen [0016], at SOTER EDNY 3228). As Dr. Sharony notes, "[i]n each of these examples the term signature is used to indicate that a sensor is used to identify a unique characteristic, fingerprint, pattern or indication that helps to recognize or identify certain events or distinguish between certain materials." (Ex. S, Sharony Decl., ¶ 60).

Defendants use the term signature in the same way. *See, e.g*., SOTER 1468 (Ex. C) ("HALO provides indications of VAPE and/or THC based on the presence of chemical signatures and particulates in the air."); SOTER 1335 (Ex. D) ( "The "Events" page is where event signatures are added, remove, and adjusted. Signatures are created from individual or multiple data sources, thresholds, timing, and machine learning algorithms."); SOTER 1367 (Ex. E) ("ADD_ALL_SENSORS: Includes all current signatures and sensors that have been pre-created including Gunshot, Help (whichever one was already selected: 911, 111, 000), Vape, THC, Masking, Aggression, Tamper, PM1, PM2.5, PM10, NH3, NO2, Sound, AQI, CO2eq, Pressure, TVOC, CO, Temp_F, Temp_C, Humidity, and Light.")

Thus, the '549 Patent's use of the phrase "abnormality matching signature" is akin to the manner in which the term signature is generally known and used in the art. (Ex. S, Sharony Decl., ¶ 62). Soter's construction is also supported by the prosecution history of the '549 Patent. For example, in a Jan. 16, 2020 Non-Final Office Action, the Examiner concluded that prior art

U.S. Patent No. 5,261,596 to Tachibana, which discloses an air quality conditioning system that detects smoking, teaches "a network interface configured to transmit a signal indicating abnormality matching signature of other smoking activity." (Ex. U, SOTER EDNY 2864). Similarly, the Examiner concluded that U.S. Patent Application No. 2016/0163168 to Brav, which discloses an audio surveillance system, teaches "a network interface configured to transmit a signal abnormality matching signature of the sound of bullying."  (Ex. U, SOTER EDNY 2865).

This understanding regarding "abnormality matching signature" is also reflected in a November 15, 2018 International Search Report in which the Examiner concluded that U.S. Patent Application No. 2010/0127865 to Marriam et al., which discloses a building security system, teaches "a network interface configured to transmit a signal indicating abnormality matching signature of vaping, other smoking activity, or sound of bullying (a public switched telephone network interface transmits a signal in response to detecting an alarm (abnormality) signal from a smoke detector sensing the presence (signature) of smoke (indicating other smoking activity)." (Ex. U, SOTER EDNY 2765).

Despite appearing in the claims, the specification, and discussed by the Examiners during the prosecution history, Dr. Brown asserts that "this term is completely absent" from the patent's claims.  (Ex. I, Brown Decl., ¶ 28).  Alternatively, he asserts that Soter's "construction is improper and unsupported." *Id.*  Dr. Brown cannot dispute that "abnormality matching signature" is a phrase used in the patent, the original claims and by the Examiners to describe detecting various conduct, including but not limited to vaping.  Further, Dr. Brown does not dispute that signature is a common term used in electronic systems that employ sensors to identify, for example, a unique characteristic, or that the '549 Patent and the Examiners used the phrase "abnormality matching signature" in a manner consistent with the common understanding of signature in the art.

Dr. Brown also takes issue with "abnormality matching signature" or "abnormality matching signature of vaping" comprising "one or more parameters." (Ex. I, Brown Decl., ¶¶ 41-43). However, as discussed above, it was known in the art that air quality sensors detected the content or condition of the air using one or more parameters. *See, e.g.,* (Ex. M: Sharp, [0004] at SOTER EDNY 3173); *see also* (Ex. T, Sharony Dep. 57:11-17). That the patent discloses a preferred embodiment and best mode that uses three sensors to detect vaping is of no moment, because the Federal Circuit has made clear that it is improper to limit the construction of a claim to a preferred embodiment. *See Thorner v. Sony Computer Ent'mt Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("'[i]t is [] not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims;"); *Falana v. Kent State University*, 669 F.3d 1349, 1354-55 (Fed. Cir. 2012) ("this court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.") (quotations omitted); *AllVoice Computing PLC v. Nuance Communications, Inc.*, 504 F.3d 1236, 1248 (Fed. Cir. 2007) ("every claim need not contain every feature taught in the specification."); *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1354–56 (Fed. Cir. 2003) ("Absent a clear disclaimer . . . the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the patent is limited to that context.")

Further, the '549 Patent shows that an "abnormality matching signature" can be based on one parameter alone. In the context of an abnormality matching signature of bullying, the '549 Patent discloses the use of a sound detector that measures decibel levels to sense or detect bullying (Ex. B, col. 5:36-44), and in the context of the abnormality matching signature of vaping, the patent clearly states that detecting a signature based on temperature, hydrogen and humidity is simply

"another aspect" of the invention.  (*Id.* at col. 2:8).  *See Phillips*, 415 F.3d at 1327 ("[t]he fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives.")  This is reinforced by Dependent claims 2, 14 and 26, which specifically recite sensing or detecting vaping using three parameters.  *See id.* at 1315 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.")

Indeed, at deposition, inventor Mohammed Elbadry confirmed that vaping could be detected based on one parameter alone and that he and his co-inventors' invention and discovery was not limited to specifically detecting vape only by temperature, hydrogen and humidity.  (Ex. F, Elbadry Dep. 51:17-53:1, 146:9-12, 147:17-148:3, 100:11-12); *see also* (Ex. K, Elbadry Decl., ¶ 9).  Soter's provisional patent application, along with the other inventors during their depositions, noted the same thing.  *See* (Ex. G, Hussain Dep. 164:3-8 (detecting vape using humidity, hydrogen and temperature is "███████████████████"); (Ex. G, Hussain Dep. 178:20-179:11); (Ex. H, Peterson Dep.  90:24-91:5 (noting that vape could even be detected "████████" alone)); (Ex. J, Hussain Decl., ¶¶ 8-15); Ex. A at SOTER EDNY 3044 ("The Fly Sense solution is comprised of **one or more** Fly Sensors.") (emphasis added)

D.    **"abnormality matching signature of vaping"**

| Term/Phrase | Soter's Construction | Defendants' Construction |
|---|---|---|
| "abnormality matching signature of vaping"<br>(claims 1, 13, 25) | "one or more parameters, such as threshold values or ranges, from an air quality sensor indicating the presence of vaping" | "detectable values of the properties and/or contents of air that include temperature, hydrogen, and humidity values that taken together indicate the presence of vaping" |

13

Given the definition of "abnormality matching signature" discussed above, Soter's definition of "abnormality matching signature of vaping" necessarily follows. *See* (Ex. S, Sharony Decl., ¶ 74); (Ex. T, Sharony Dep. 125-149). The reference to "threshold values or ranges" are examples provided by the '549 patent, by way of illustration, and were not intended to be exclusive parameters. (Ex. B, col. 6:35-44).

Defendants' proposed construction is not only inconsistent with the claims, specification, and prosecution history—it also impermissibly reads an embodiment into the claims, which violates basic claim construction principles. *See Comark Communs., Inc.*, 156 F.3d at 1187; *Aria Diagnostics, Inc.,* 726 F.3d at 1301. The patent states that one embodiment of the invention is to detect vaping using an "abnormality matching signature of vaping." (Ex. B, col. 1:60-67). Detecting vape using hydrogen, humidity and temperature is "another aspect" of the invention, which was provided only as an example. (*Id.* col. 2:8-11); *see* (Ex. G, Hussain Dep. 179:9-11 ("███████████████████████████████████████████████████")); (Ex. J, Hussain Decl., ¶¶ 8-15).

Further, Defendants' construction seeks to improperly import into the independent claims the requirements of, for example, dependent claim 2, which specifically requires the abnormality matching signature of vaping to include temperature, hydrogen and humidity. This violates basic principles of claim construction and claim differentiation. *See Phillips*, 415 F.3d at 1314-15*; Mycogen Plant Sci., Inc.*, 243 F.3d at 1329.

Defendants' construction ignores the fact that the '549 Patent uses the phrase "abnormality matching signature" in a manner consistent with the general use of the term "signature" in the art, which is confirmed by how the Examiners referenced "abnormality matching signature" during prosecution. At no time did the applicants claim that the Examiner was misconstruing "abnormality

matching signature" and that it should be given a narrower meaning.  This supports the conclusion that a POSA would not understand the patent to be limiting an "abnormality matching signature of vaping" to the detection of temperature, hydrogen and humidity alone.  *See Phillips,* 415 F.3d at 1317 ("the prosecution history provides evidence of how the PTO and the inventor understood the patent."); (Ex. G, Hussain Dep. 191:2-9).

Dr. Brown's criticism of Soter's construction ignores the fact that temperature, hydrogen and humidity were incorporated into the claims as <u>dependent</u> claim limitations.  If he were correct and independent claims 1, 13 and 25 covered only the three air quality sensors mentioned in claims 2, 14 and 26—dependent claims 2, 14 and 26 would be redundant and make no sense within the larger context of the patent.  While Dr. Brown relies on the Summary of the Invention's reference to detecting vape via temperature, hydrogen and humidity, this was only, as the patent clearly states—one "aspect" of the invention.  (Ex. B, col. 2:8-10).

Dr. Brown also points to a portion of the detailed description that states: "Vaping may be detected by specific range combination of humidity, hydrogen, and temperature, which is defined as signature in this disclosure." (Ex. I, Brown Decl., ¶ 52 (citing '549 Patent at col. 9:21-23). However, Dr. Brown ignores that the sentence begins with "vaping may be detected by".  The inventors' use of the word "*may*" shows their recognition that this was one option, but not the only option, as supported by the Summary of the Invention.  Further, that passage does not even reference the phrase "abnormality matching signature of vaping."  As the inventors explained, consistent with their overall discovery, this passage was intended to reflect that a signature could include humidity, hydrogen and temperature, but could also encompass other air quality sensors or even one of these three alone.  (Ex. F, Elbadry Dep. 96:3-101:23 ("███████████████████████████"), 146:9-12, 139:5-140:5, 147:17-148:3); (Ex. G, Hussain Dep. 191:2-9 ("████████████

15



."); *id.* at 190:7-19 (

")); (Ex. H, Peterson Dep. 90:24-91:5, 99:9-17); (Ex. K, Elbadry

Decl., ¶ 9 ("

")); (Ex. J, Hussain Decl., ¶¶ 8-15).  Moreover, as Inventor

Hussain testified, because a POSA would understand that many known air quality sensors could be

used to practice the invention and identify an abnormality matching signature of vape, the inventors

did "not need to list them [all] out."  (Ex. G, Hussain Dep. 206:12-22); *id.* at 174:19-21 (

.")

### E. "a signature"

| Term/Phrase | Soter's Construction | Defendants' Construction |
| --- | --- | --- |
| "a signature" (claim 25) | "a set of one or more parameters that provides an abnormality matching signature of vaping" | "detectable values of the properties and/or contents of air that include temperature, hydrogen, and humidity values that taken together indicate the presence of vaping" |

"[A] signature" appears in independent claim 25, which also recites "abnormality matching

signature of vaping."

> 25. A sensor system for identifying vaping at a site, the sensor system comprising:
> an air quality sensor configured to detect air quality; and
> a network interface configured to transmit a signal indicating <u>abnormality matching
> signature of vaping,</u>
> wherein the vaping is identified when the detected air quality includes <u>a signature</u>.

(Ex. B) (emphasis added). Given that "a signature" does not rely on "abnormality matching

signature of vaping" as an antecedent basis and is not the same phrase, "a signature" should have a

different definition.  *See Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d

1111, 1119 (Fed. Cir. 2004) (different claim terms convey different meanings).  This understanding

is supported by the Summary of the Invention, which states that:

> In an embodiment, a sensor system for identifying vaping, other smoking
> activities, and bullying at a site includes an air quality sensor configured to
> detect air quality, a sound detector configured to detect sounds, and a
> network interface configured to transmit a signal indicating abnormality
> matching signature of vaping, other smoking activity, or sound of bullying.
> The vaping or another smoking activity is identified based on the detected
> air quality, and the bullying is identified based on the detected sound.
> ….
> **In another aspect**, the vaping or the another smoking activity is identified
> when the detected air quality includes a signature. The signature includes a
> temperature range, a hydrogen range, and a humidity range.

(Ex. B, col. 1:61-2:11) (emphasis added).  While they may be related, they are not necessarily the

same.  The specification uses the term "a signature" alone to reflect a specific type of signature or

set of parameters from the abnormality matching signature of vaping.  When the specification

discusses detecting vape via temperature, hydrogen and humidity, it does so in the context of

discussing "a signature" or "the signature." (*id*. at col. 2:8-10); (col. 5:4-6) ("Since vaping has a

signature in temperature, humidity, and hydrogen ranges, vaping may be identified based on the

signature.")  In those contexts, the specification uses the term "a signature" or "the signature" to

identify a specific type of abnormality matching signature of vaping.  (Ex. S, Sharony Decl., ¶¶ 84-

85)

Because dependent claim 26 specifically adds the requirement that "the signature" includes

temperature, hydrogen and humidity—it would be improper to import those elements into the

definition of "a signature."  *See Phillips*, 415 F.3d at 1314-15*; Mycogen Plant Sci., Inc.*, 243 F.3d

at 1329; (Ex. H, Peterson Dep. 99:9-17) (noting that signature could involve just "███████"

alone).  Defendants' construction fails to differentiate between claims 25 and 26 and treats

"abnormality matching signature of vaping" and "a signature" as the same term having the same

meaning.  Defendants' construction should be rejected.  *See* (Ex. T, Sharony Dep. 125-149).

F.      **"the abnormality matching signature includes …" or "the signature includes …"**

| Term/Phrase | Soter's Construction | Defendants' Construction |
|---|---|---|
| "the abnormality matching signature includes …" (claims 2, 14) or "the signature includes …" (claim 26) | "the parameters indicating the presence of vaping includes a temperature range, a hydrogen range, and a humidity range" | "detectable values of the properties or contents of air that include temperature, hydrogen, and humidity values that taken together indicate the presence of vaping" |

Dependent claims 2 and 14 describe one type of signature within the scope of the

"abnormality matching signature" recited in claims 1 and 13. (Ex. S, Sharony Decl., ¶ 88)

Dependent claim 26 provides one type of "signature" included within the scope of claim 25.

Dr. Brown criticizes Soter's construction for relying upon the following passages, which he claims

require a narrow construction of "abnormality matching signature of vaping" and "a signature":

> In another aspect, the vaping or the another smoking activity is identified
> when the detected air quality includes a signature. The signature includes a
> temperature range, a hydrogen range, and a humidity range. (Ex. B, col. 2:8-
> 10)  "Vaping may be detected by specific range combination of humidity,
> hydrogen, and temperature…." (col. 9:21-23)

(Ex. I, Brown Decl., ¶ 46).  In other words, Dr. Brown, like the Defendants, is advocating that

Dependent claims 2, 14 and 26 should have the same scope and construction as Independent claims

1, 13 and 25.  Here again, providing the same scope to dependent and independent claims would

violate the basic principle of claim differentiation and render the language in dependent claims 2,

14 and 26 meaningless.  *See Rambus Inc. v. Infineon Techs. Ag*, 318 F.3d 1081, 1093 (Fed. Cir.

2003) (rejecting construction that would "render claim language in dependent claims"

meaningless.)

G.      "identify vaping" or "vaping is identified" (claims 1, 13, 25)

| Term/Phrase | Soter's Construction | Defendants' Construction |
|---|---|---|
| "identify vaping" (claim 1, 13) or "vaping is identified" (claims 1, 13, 25) | "determining that vaping is present at a site based on one or more measured parameters from an air quality sensor indicating the presence of vaping" | "recognize the detected temperature, hydrogen, and humidity values that taken together indicate the presence of vaping" / "recognizing the detected temperature, hydrogen, and humidity values that taken together indicate the presence of vaping" |

Given the definition of "abnormality matching signature of vaping" discussed above, Soter's definition of "identify vaping" and "vaping is identified" necessarily follows. (Ex. S, Sharony Decl., ¶ 93).  This definition is supported by the specification, which states, for example:

> A sensor system for identifying vaping, other smoking activities, and bullying at a site includes an air quality sensor configured to detect air quality, a sound detector configured to detect sounds, and a network interface configured to transmit a signal indicating abnormality matching signature of vaping, other smoking activity, or sound of bullying. Vaping or another smoking activity is identified based on the detected air quality, and bullying is identified based on the detected sound. (Ex. B, Abstract)

Defendants insist that vaping may only be identified when temperature, hydrogen and humidity are detected.  But the specification characterizes such a method as only "another aspect" of the invention and not a requirement.  (Ex. B, col. 2:8-10).  The specification states that "vaping may be identified" based on those components, but does not state that those elements are necessary for identifying vaping, or expressly disavow other ways to detect vape.  *(Id.,* col. 5:5-6)

H.      "sound detector"

| Term/Phrase | Soter's Construction | Defendants' Construction |
|---|---|---|
| "sound detector" (claim 6) | "a sensor that detects sound levels in the environment" | plain and ordinary meaning, no construction necessary Alternatively, "an electronic sensor capable of detecting sounds" |

The '549 Patent teaches that an object of the invention is to provide a sensor system that enables the detection of vaping, smoking and bullying in areas or environments where privacy concerns may exist.  (Ex. B, col. 1:35-39).   To this end, the '549 Patent discloses the use of sound detectors that detect sound levels in the environment.  *See*, *e.g. id.* at col. 8:59-64) ("In particular, the sound sensor 210 detects sound levels (e.g., decibel (dB)) in the environment. For example, FIG. 3A shows detected sound levels in the form of voltage amplitudes.") (emphasis added); (Ex. T, Sharony Dep. 150:17-151:7).   As Soter's construction is consistent with the patent's disclosure and at least one object of the invention, Soter's construction is appropriate.  *See Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008) (construing claim term to "achieve the overall object of the invention").   While Dr. Brown asserts that Soter's "proposed constructions lack support" (Ex. I, Brown Decl. at ¶ 60), they are supported by the patent's disclosure and exemplify one of the objectives of the invention.

### I.      "detected sounds"

| Term/Phrase | Soter's Construction | Defendants' Construction |
|---|---|---|
| "detected sounds" (claim 6) | "sound levels measured by a sound detector" | plain and ordinary meaning, no construction necessary  Alternatively, "sounds detected by the sound detector" |

Given the definition of "sound detector" discussed above, Soter's definition of "detected sounds" necessarily follows.  (Ex. S, Sharony Decl., ¶ 104); (Ex. T at 150:17-151:7).  Accordingly, the intrinsic record decisively favors interpreting "detected sounds" to mean "sound levels measured by a sound detector."

## VI.   CONCLUSION

For at least the reasons above, Soter respectfully requests that this Court adopt its proposed constructions of disputed claim terms and reject Defendants' proposed constructions.

Dated: March 5, 2021                    /s/ Wendy R. Stein

                                        Wendy R. Stein
                                        Jean E. Dassie
                                        **GIBBONS P.C.**
                                        One Pennsylvania Plaza, 37th Floor
                                        New York, New York 10119
                                        Tel:  (212) 613-2043
                                        wstein@gibbonslaw.com
                                        jdassie@gibbonslaw.com

                                        Christopher H. Strate
                                        Christine A. Gaddis
                                        **GIBBONS P.C.**
                                        One Gateway Center
                                        Newark, NJ 07102
                                        Tel: (973) 596-4500
                                        cstrate@gibbonslaw.com
                                        cgaddis@gibbonslaw.com

                                        *Attorneys for Plaintiff and Counterclaim Defendant*
                                        *Soter Technologies LLC and Third Party Defendant*
                                        *Derek Peterson*